## MEGOWN v. FULLER, ET AL.

(No. 1434; April 9, 1928; 266 Pac. 124)

(Rehearing June 19, 1928; 268 Pac. 189)

212

*M. C. Burk, F. A. Michels* and *W. E. Hardin,* for appellant.

*E. E. Enterline,* for defendants and respondents.

KIMBALL, Justice.

This is an action for conversion of mortgaged cattle. Trial was had without a jury. At the conclusion of plaintiff's evidence, the trial court held that plaintiff had not made out a case, and gave judgment for defendants. The plaintiff appeals.

November 3, 1919, defendant George B. Fuller, to secure the payment of 2 promissory notes amounting to $15000, due November 1, 1920, gave to the First National Bank of Shoshoni, Wyoming, a chattel mortgage of "his entire herd of cattle," being 454 head, 6 head branded flying H and the rest branded T6.

November 1, 1920, the mortgagor, to secure 3 notes amounting to $16000, due November 1, 1921, gave a similar mortgage of "his entire herd of cattle," being 394 head, 4 head branded flying H and the rest branded T6.

December 17, 1921, the mortgagor, to secure two notes amounting to $13000, due June 30, 1922, gave a similar mortgage of "his entire number of cattle," being 350 head all branded T6.

November 16, 1922, the mortgagor, to secure 2 notes amounting to $14000, due October 1, 1923, gave a similar mortgage of "his entire number of cattle," being 238 head all branded T6.

January 30, 1924, the mortgagor, to secure 2 notes amounting to $15500, due October 1, 1924, gave a similar mortgage of "his entire number of cattle," being 226 head all branded T6.

The mortgages included the "increase" of the cattle, the described brands, and other property not necessary to be mentioned. The first two mortgages were to the bank. The others were to S. H. Megown, who, as the cashier of the bank, took the notes and mortgages in his name for the use and benefit of the bank. Each mortgage was filed with the county clerk of the proper county a few days after its execution.

All of the mortgages except the last have been released. The one of November 3, 1919, was released December 17, 1920; the one of November 1, 1920, was released June 9, 1922; the one of December 17, 1921, was released January 15, 1923, and the one of November 16, 1922, was released May 2, 1924. The releases were by written instruments filed with the county clerk. Each of the first two releases recites that, the mortgage "having been satisfied by the payment of the debt secured thereby," the county clerk is authorized to discharge the mortgage. Each of the last two releases recites that, "in consideration of the payment of the debt named therein," the mortgagee releases the mortgage.

The debt evidenced by the notes secured by the unsatisfied mortgage of January 30, 1924, remains unpaid.

About December 1, 1924, the First National Bank of Shoshoni, went into voluntary liquidation, and the plaintiff, S. H. Megown, was appointed "liquidating agent."

In May, 1925, when the secured debt amounted to over $16600, the plaintiff published notice of foreclosure of the mortgage of January 30, 1924, but sold no property, for the reason, as he testifies, that there was no property to be found. It seems from the evidence that there were at that time no more than 20 or 30 head of T6 cattle on the range.

August 25, 1925, the plaintiff, as liquidating agent of the bank, commenced this action against the mortgagor, Caroline Fuller and Karoline Fibiger. Caroline Fuller is the wife of the mortgagor, and Karoline Fibiger is the mother of Caroline Fuller.

Defendant George B. Fuller, the mortgagor, has been at all times the owner of the T6 brand, and each of the successive mortgages included all cattle of that brand, their increase and the brand itself. The first two mortgages included also a few cattle of the flying H brand, but the other mortgages included only the T6 cattle. There was testimony to the effect that, when the third mortgage was being prepared, the mortgagor told the bank that the flying

H cattle might as well be omitted, as there were so few of them, and it would seem that Caroline Fuller, from that time at least, claimed the cattle of the flying H brand that had been included in the former mortgages.

The flying H brand formerly belonged to Park Fuller who, in January, 1921, transferred it to George J. Fuller, minor son of defendants George B. and Caroline Fuller. In November, 1922, George J. Fuller transferred it to his mother, Caroline Fuller, who has since been the record owner of that brand, claiming all cattle bearing it.

The CF brand has at all times belonged to defendant Karoline Fibiger. No cattle of that brand were described in any of the mortgages.

The defendant George B. Fuller has had the active care and management, including the superintendence of branding of calves, of the flying H cattle claimed by his wife and the CF cattle claimed by Mrs. Fibiger, as well as of the T6 cattle belonging to him. All the cattle, as is customary in this state, have been permitted for a large part of the time to run at large on the open range. The means of identification is the brand. See Secs. 3091, 3095, 4682, Wyo. C. S. 1920. It was of course the duty of the mortgagor, in branding calves of the cattle in his care, to place the T6 brand, or, at least, to place no other confusing brand, on the calves of T6 cows.

The plaintiff claimed, and undertook to prove on the trial, that the mortgagor, during the period covered by the successive mortgages, had placed the flying H and CF brands on T6 cattle that were covered by the mortgages; and that, as a result of this practice, a large part of the mortgaged cattle had lost their means of identification as mortgaged property, and been wrongfully mingled with the cattle claimed by Mrs. Fuller and Mrs. Fibiger.

To establish the fact of misbranding and mingling of cattle, there was evidence that the T6 brand on several grown cattle had been vented, and the animals rebranded with flying H or CF; that some calves of T6 cows were

branded with flying H or CF, and that calves bearing the flying H brand were seen following T6 cows on the range. Some of this evidence related to a time as early as 1921, and some as late as 1924. One cow branded CF and with the T6 brand vented, was produced for inspection at the trial. There was considerable evidence in regard to the natural probable increase and loss of cattle in that locality, the plaintiff contending that while the cattle bearing the flying H and CF brands had been increasing for several years, the T6 cattle, during the same time, had not increased. Defendants Mrs. Fuller and Mrs. Fibiger denied knowledge of any misbranding. Defendant George B. Fuller denied the charge of wrongful misbranding, but admitted that on two or three occasions T6 cows or calves had been branded with the other brands. The acts he admitted, he explained. His explanations need not be repeated here; nor need we express an opinion as to whether or not they seem to us satisfactory.

The defendants offered no evidence except such as was brought out by their examination of the witnesses produced by the plaintiff. The defendants were examined "as if under cross-examination," as provided by Sec. 5808, Wyo. C. S. 1920, as amended by Ch. 116, Laws of 1921. The plaintiff introduced in evidence all the above mentioned chattel mortgages. The defendants, on cross-examination, proved the releases of all but the last mortgage. When the plaintiff rested, the defendants moved to strike from the evidence all the released mortgages. The motion was sustained, on the ground, evidently, that the plaintiff had failed to establish any mistake or fraud that would justify the setting aside of the releases. The defendants then moved for findings and judgment in their favor. That motion also was sustained, and judgment for defendants, from which plaintiff appeals, followed.

In striking from the evidence the released mortgages the trial court in effect held that the plaintiff must rely solely on the lien of the mortgage of January 30, 1924. We think this was error.

The·giving of the new notes and mortgages in this case was an example of the common practice of banks in handling slow loans on chattel security. As testified by plaintiff, "a new set of papers would be made out in order to keep the thing up to date, out of the past-due column." Each new mortgage was but a renewal or continuation of the previous one and intended to secure original debt which was never paid, though the ·amount varied from time to time.

In Bachman v. Hurtt, 26 Wyo. 332, 184 Pac. 709, we quoted with approval from Cyc. (now 41 C. J. 582) this:

"Entering satisfaction of a mortgage and taking a new one, when designed by the parties to be merely a continuation of the first mortgage, and when the two acts are practically simultaneous or parts of the same transaction, is not an extinguishment of the mortgage, but a renewal thereof, and does not give priority to an intervening judgment or mortgage creditor of the mortgagor, especially where it is done in good faith, in ignorance of the existence of the intervening lien, and without any intention to release the lien of the mortgage."

A point is made of the fact that in the case at bar the old mortgages were not released simultaneously with the giving of the new, but often not until several months later. We think the delay in releasing the old mortgages was of no importance. The debt was renewed, and then, as a part of the transaction, it was the understanding, expressed or implied, that the new mortgage to secure the renewed indebtedness would immediately take the place of the old. We can see no reason for holding that the rights of the parties to this action should be at all affected by the bank's delay in filing the releases. Had there been an interval between the release of the old mortgage and the filing of the new, that fact might have been of some importance; but here,

from the time of the first mortgage, there was no moment when the bank did not have a lien on the T6 cattle charged to have been converted.

During the course of the dealings with respect to the loan, the bank would advance to the mortgagor additional funds to cover expenses of running the cattle. These additional loans would be evidenced for a time by what were referred to as "expense notes." Mortgaged cattle were from time to time sold with the consent of the bank, and the proceeds of the sales sometimes paid on the indebtedness. When the notes and mortgages were renewed, a settlement of accounts would be had, and the new notes would be for the total balance due, including the amount of the so-called expense notes and interest to date, after crediting the mortgagor with amounts received from the sales of the cattle. The evidence of these settlements of accounts showed a motive for the renewals, but we cannot see that it had any tendency to support the defendant's contention that the mortgagee was not entitled to prove the released mortgages for the purpose of showing its continued interest in the property. Hill v. Beebe, 13 N. Y. 556; Austin v. Bailey, 64 Vt. 367, 24 Atl. 245; Hoy v. Biladeau, 110 Ore. 591, 223 Pac. 241.

The effect in a particular case of a release of a mortgage must depend largely on the right that is claimed by virtue of it. One who has acquired a right to property in reliance upon a release of a mortgage would, of course, be in a situation very different from that of a person who, without the knowledge of the mortgage, has taken property while it was subject to a mortgage, and then seeks protection by claiming that the mortgagee lost his lien by a subsequent release and renewal as in the case at bar.

The case of Cornwell v. Moss, 95 Kan. 229, 147 Pac. 824, is peculiarly in point. Property covered by a chattel mortgage was sold by the mortgagor. The holder of the mortgage, having no knowledge of the sale, lent the mortgagor an additional sum, taking a new mortgage for the total

amount on the same and other property, and releasing the first mortgage on the record. In an action involving the right to the property that had been sold by the mortgagor, the holder of the mortgage introduced in evidence the first mortgage, but the court afterwards struck it out on the ground that it could not be relied on in that action. This, on appeal, after a thorough discussion of the subject, was held to be error, the court saying in its syllabus, that the holder of the mortgage was not by the renewal and release "necessarily precluded from relying upon the lien of the first mortgage, as against one who purchased an interest in the property from the mortgagor while the first mortgage was of record and unreleased." It is hardly necessary to say that one charged with conversion of the mortgaged property would have no better right than a purchaser from the mortgagor. The opinion in Cornwell v. Moss cites numerous authorities showing that a release of, or the failure to renew, a mortgage may be disregarded when justice requires it.

The recitals in the releases to the effect that they were made because of the payment of the debt were no more conclusive than the recital of payment in a receipt or the recital of the consideration in a deed, and, at the most, were only admissions of payment that did not preclude the plaintiff from showing that the debt was not in fact paid. In Cornwell v. Moss, supra, the mortgagor, in releasing the first mortgage, acknowledged its payment. See, also, Chappel v. Allen, 38 Mo. 213; Seiberling v. Tipton, 113 Mo. 373, 21 S. W. 4; Hoy v. Biladeau, 110 Ore. 591, 223 Pac. 241; Pettit v. Louis, 88 Nebr. 496, 129 N. W. 1005, 34 L. R. A. (N. S.) 356.

We think it clear from the foregoing authorities that, if the defendants converted a part of the mortgaged property before the giving of the last chattel mortgage, the plaintiff, to show the mortgagee's interest in the property at the time of the conversion, had a right to rely on the lien of the earlier mortgages, notwithstanding the releases.

There is some contention that the evidence as a whole, including the earlier mortgages, was not sufficient to prove a conversion of any of the mortgaged cattle. We cannot affirm the judgment on that ground. We do not know what view the trial judge would have taken of the evidence if he had believed that the plaintiff had a right to rely on the lien of the earlier mortgages. We avoid expressing our view of the evidence further than by saying that a trier of the facts, if he believed the plaintiff's witnesses, would have been justified in finding that some of the mortgaged cattle had been converted.

The judgment will be reversed, and the case remanded for a new trial.

Blume, Ch. J., and Riner, J., concur.

### ON PETITION FOR REHEARING

Kimball, Justice.

A petition for rehearing has been filed. The petition and brief in support thereof contain nothing that causes us to doubt the correctness of our decision as announced in our former opinion (266 Pac. 124), and in denying a rehearing it will be useless to enlarge on the reasons that caused us to hold that the plaintiff was prejudiced by the ruling of the trial court striking from the evidence the released chattel mortgages.

Our statement of the facts is conceded to be correct, except the statement that, "one cow branded CF and with the T6 brand vented, was produced for inspection at the trial." A witness testified that he saw this animal at the court house, but it now appears that we were in error in saying that the animal was produced at the trial. The witness was referring to another time—a former term of court. This error, of course, would not affect our view on the matters in controversy in this court.

We stated that the giving of the new notes and mortgages in this case was an example of the common practice of

banks in handling slow loans on chattel security. Counsel doubts very much whether this court can take judicial notice of the custom of banks in such a matter. We did not use the word "custom" and did not suppose our language would be interpreted as an intimation that we were taking judicial notice of a custom. The criticized phrase is merely a part of our description of a transaction for renewal of an indebtedness, and whether the method pursued—the giving of new notes and mortgage and cancellation of the old —was the customary method or not, we are of the opinion that for the purposes of this case, so far as disclosed by the record, the transaction should be treated as a renewal. Counsel says that the custom with which he is familiar is that banks retain the old notes and mortgages and do not discharge the mortgage of record. The books, however, are full of cases showing that a secured indebtedness is frequently renewed by the method followed in the case at bar, and we do not recall any case in which the bank has claimed the right to retain the old notes and to keep both the old and new mortgages of record.

Counsel is apprehensive that our opinion has the effect of holding that a chattel mortgage can never be discharged of record until the entire mortgage indebtedness is paid. It is hardly necessary to say that our opinion has no such effect. We expressly stated that the effect of a release must depend largely on the right that is claimed by virtue of it. The point decided in this case is the effect under the facts of the releases on the rights of the mortgagee and the defendants in an action by the former against the latter for conversion of a part of the mortgaged property while subject to the mortgage lien.

*Rehearing denied.*

BLUME, C. J., and RINER, J., concur.